Robert E. LYNCH, Fred Hoffman and Phyllis Klein, Plaintiffs,

v.

John R. TORQUATO, Edna Lugar, and Virgil Moraca, Defendants.

Civ. A. No. 64–052.

United States District Court
W. D. Pennsylvania.

April 1, 1964.

McWilliams, Margolis & Coppersmith, Johnstown, Pa., for plaintiffs.

Walter A. Criste, Cresson, Pa., for defendants.

DUMBAULD, District Judge.

Plaintiffs, registered voters of the Democratic Party in Cambria County, Pennsylvania, bring this suit against officers of the Democratic County Committee of that county to enjoin them from conducting the election of the County Chairman in the manner provided by the existing rules of the Committee, and to require the Chairman to be elected by popular vote of all registered Democratic voters at the 1964 primary election.

Plaintiffs base their complaint upon the doctrine of Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), and contend that there is a gross disproportion in the number of registered Democrats in the various precincts of Cambria County. The Cambria County Committee is composed of one Committeeman and one Committeewoman from each of the 190 voting precincts in the county. The County Chairman is elected by majority vote of the County Committee. The party organization has nothing to do with the laying out the voting precincts.

Plaintiffs contend that this method violates the "equal process clause" [*sic*] and the due process clause of the Fourteenth Amendment "in that plaintiffs' rights to vote for a County Chairman are substantially impaired".

Actually Baker v. Carr involved only the equal protection clause. It provided no substantive standards, but merely held that a case involving "dilution" of a voter's rights presented a justiciable controversy (369 U.S. at 237, 82 S.Ct. 691, 7 L.Ed.2d 663).

The problem of providing satisfactory substantive standards is an unenviable one, which the federal courts will face in future litigation. It will involve considerations of history, geography, convenience, political groupings, and other matters so refractory to regulation by the rule of law that they convinced Mr. Justice Frankfurter that the subject was one altogether of political character, determinable only by considerations of expediency and statecraft, and that the courts should refrain from entering the political thicket. However, the majority of the Supreme Court were less hesitant, and in due time will doubtless fashion the machetes needed to clear a path towards the emergent temple of democracy.

In Pennsylvania the basic consideration will necessarily be to prevent the possibility of domination by Philadelphia. Ever since the era when our ancestors in Western Pennsylvania were fighting Indians and the thrifty Quakers in the City of Brotherly Love were reluctant to pay taxes to provide for defense of the frontier, the tension between East and West has been strong, and led to the establishment of the State capital at a neutral spot where one Harris had established a ferry over the Susquehanna. Moreover the smaller counties need

recognition of their interests as distinguished from the particular interests of Pittsburgh, or of Philadelphia, as the case may be. Any workable and adequate system of representation must give adequate strength to the three separate spheres of interest involved, and at the same time keep each voter's franchise from "dilution", and avoid any unfair or artificial advantage to either political party in their struggles for victory at the polls.

After these wayside reflections about the interesting possibilities that might arise in cases which are not before this Court, we turn to the case at bar.

Whatever may be the ultimate ramifications of Baker v. Carr, it is clear that it gives no support to plaintiffs here.

Simply stated, a rule prohibiting dilution of a voter's right to vote can afford no protection to a plaintiff who has no right to vote. There is then nothing to be diluted.

From plaintiffs' own statement of the case, it is plain that the County Chairman is not a public official elected by registered voters of the county. No registered Democratic voter has a right to vote for such an official. No such office has been established by law and included among the offices named on the ballot to be chosen by the voters.

Whatever the situation may be in other States [see Smith v. Allwright, 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987 (1944)], in Pennsylvania party candidates for all State and local offices are chosen by a direct primary. Without racial discrimination of any kind, any qualified candidate can get his name put on the ballot by filing a petition signed by a sufficient number of registered voters. Except for national party conventions for selecting the nominees for President and Vice-President, selection or election of candidates by a convention is a thing of the past in Pennsylvania.

Party officers, such as defendants, are functionaries of a private organization, chosen in accordance with the party's rules. They are in no sense public of-

ficers. They are not elective officers, for whom registered voters may cast a ballot. Hence it can not be said that plaintiffs have any right to vote which has been "diluted".

█ Under Pennsylvania law, a party need not establish such an office as County Chairman. If it does, it may provide for his selection in any manner it sees fit. The law does not even require that members of the County Committee be elected by the voters, though in practice they are.

The governing provision of law reads:

"There may be in each county a county committee for each political party within such county, the members of which shall be elected at the spring primary, or appointed, as the rules of the respective parties within the county may provide. The county committee of each party may make such rules for the government of the party in the county, not inconsistent with law or with the State rules of the party, as it may deem expedient, and may also revoke, alter or renew in any manner not inconsistent with law or with such State rules, any present or future county rules of such party. No such rules shall be effective until a certified copy thereof has been filed in the office of the county board of elections. The members of all other party committees, and all other party officers whose election is required by the party rules, shall also be elected at the spring primary, in the manner provided by this act." (25 P.S. § 2837)

Supervision of local rules by the State organization is provided by 25 P.S. § 2834:

"The State committee of each political party may make such rules for government of the party in the State, not inconsistent with law, as it may deem expedient; and may also revoke, alter or renew, in any manner not inconsistent with law, any present or future rules of such political party. No such rules shall

be effective until a certified copy thereof has been filed in the office of the Secretary of the Commonwealth."

From the foregoing it is clear that plaintiffs have no legal rights the violation of which could give rise to a claim upon which relief could be granted.

It is also clear that plaintiffs have no standing to sue. Any right based upon Baker v. Carr would be a purportedly constitutional right; and it is a fundamental principle of law (recognized in Baker v. Carr itself, 369 U.S. at p. 204, 82 S.Ct. 691, 7 L.Ed.2d 663) that no one may raise a constitutional question who is not adversely affected by the action complained of. Premier-Pabst Sales Co. v. Grosscup, 298 U.S. 226, 227, 56 S.Ct. 754, 80 L.Ed. 1155 (1936); Ex parte Albert Levitt, 302 U.S. 633, 638, 58 S.Ct. 1, 82 L.Ed. 493 (1937); Tileston v. Ullman, 318 U.S. 44, 46, 63 S.Ct. 493, 87 L. Ed. 603 (1943); Doremus v. Board of Educ., 342 U.S. 429, 432–433, 72 S.Ct. 394, 96 L.Ed. 475 (1952).

Consequently, defendants' motion to dismiss must be granted.

Having said enough to dispose of the case, it were the part of wisdom to emulate the character of whom Vergil wrote: *"Dixit, pressoque obmutuit ore."* [1] But the writer of this opinion having once been a Democratic County Chairman in Fayette County, the occasion occurring by reason of this case to think about the functioning of a County Chairman arouses nostalgic recollections and the impulse to reminisce is irresistible. As the poet said *"D'antico amor sentì la gran potenza"*. [2] The thrill of the firehorse, long turned out to pasture, at the clang of the alarum bell pervades the marrow of one's bones.

My service as County Chairman occurred during the aftermath of the Hoover depression. It was a dispiriting sensation to talk day after day with people out of work, for whom I could do nothing. There simply were no jobs for them, and they were ordinarily not qualified for whatever few jobs there were. Social security, unemployment compensation, public assistance, relief, and the panoply of other devices now inherent in the so-called "welfare state" were not then established. Families were living in burned-out coke ovens and starving. Postwar prosperity and inflation has changed the picture now. It was a physical fact in those days that when I would open the door of my private office to let one person out, two or three would be leaning against it of the throng packing the crowded anteroom.

So I learned well the lesson that the function of a Democratic County Chairman is twofold: (1) to get jobs for deserving Democrats from his county on local, State, or federal payrolls; and (2) to carry his county for every Democratic candidate on the party ticket in his county at every election.

When I became County Chairman, I was given some good advice by a wise and seasoned party veteran: "Don't promise anyone anything you can't or won't do; and remember that if anything good happens, the credit must go to the candidates then running or next at bat; but if anything bad happens, you are always the s—— of a b——." I endeavored to adhere faithfully to these precepts.

George Washington forcefully exclaimed, before the Constitution of the United States was adopted, "Influence is not government."

A County Chairman has no legal or governmental authority whatever. He is not a public officer at all. Whatever he may be able to accomplish is purely the result of influence. The legal power belongs entirely to the officials. But in a well-functioning administration, if the County Chairman is competent and dependable and shows good judgment in his dealings, the officials to whom the legal powers of government are entrusted by the people in accordance with law,

1. *Anglice*, "he spoke, and closed his lips in silence".

2. "Of ancient love I felt the mighty spell." Dante, Purgatorio, XXX, 39.

will ordinarily give great weight to his recommendations regarding men and measures. But if he falls short, they are free to disregard him entirely.

And, if officials are elected who are obstinate or have their own personal axes to grind, there is nothing the County Chairman can do about it, even though he clearly sees that the conduct of the legally elected officers will be detrimental to the public or to the party.

When I became County Chairman, our entire ticket except for two offices was elected. But two of the victorious candidates, over my objection, insisted upon appointing a Republican crony to work in their offices. I had no remedy under the Fourteenth Amendment. It was they and not I whose name had appeared on the ballot and on the certificate of election.

The slogan for this campaign was "Clean Out the Courthouse", and I intended, instead of the usual cards and matches, to distribute cakes of soap and toy brooms to the voters. I soon found, however, that there was not a big enough campaign fund to pay for these unusual items. The cupboard was pretty bare then. Subsequently the day of mammoth budgets has dawned. Nowadays every voter wants to be a worker, and thinks that his automobile should be hired to haul voters to the polls. As County Chairman I loved a voter who could and would walk to the polls under his own steam.

I was young and new to the job. Sometimes it offended people who had been Democrats since before I was born when I asked my stock questions put to every applicant: "Are you a Democrat? How long have you been a Democrat? What have you done for the Democratic Party[3] that makes you think you deserve this job you are applying for?" Everyone soon realized that I was merely doing my duty conscientiously and that I

could not possibly know every good Democrat right off the bat, without some experience in the chairmanship.

Perhaps these recollections dehors the record will add point to the decision, and clarify by illustration the clear distinction between the legal powers of a public official and the political functions of a party worker.

Both law and horse-sense indicate that the plaintiffs in the case at bar can not prevail. Defendants' motion to dismiss is granted.

---

3. The refinement of inserting the word "lately" at this point had not occurred to me. Since the currency of Vice-President Barkley's anecdote it would be *de rigeur*.